Mark Shurtleff, Attorney General, Alpine Straightening Systems v. State Farm Mutual Automobile I The other problem I had was that it did not appear to me that either at the time that the amended complaints were filed or afterwards that there was ever a motion of any kind filed by your clients. There was a brief, but you never filed anything that was called a motion. Isn't that right? When you filed the appellate brief, Your Honor? No. I am talking about what was filed in the district court. As I understand it, there was never a motion filed. To file late? Yes. For excusable neglect that either invoked Rule 6 or Rule 60 or any rule. Right. Yes. That is my… To excuse the late filing of the complaint. Yes. I mean, we can talk about this later, but just on a fact question, I mean, the Mississippi case, there was a motion filed seeking extension, and I am misunderstanding the record. I was not involved at the time, but I think, I do not know if there was. We can sort this out. Excuse it, but I have to go back and look at it. I was not prepared with that fact today. Okay. Thank you. Your Honor, would you like me to proceed with the discussion, or we still need to wait for the jurisdictional information? No. I think we have pursued the jurisdictional stuff enough. Well, if I may then, very quickly, obviously, the concern is that whether we have stated that, met that standard. Conscious parallelism clearly is undisputed in this case. We know it is there. And as Twombly said, that brings it very close. So, scale of justice, we are very close to meeting the standard because we have, and it is undisputed, this conscious parallelism. What tips the balance to a conspiracy, to the buyer cartel? I think Judge Wilson, in particular, described the fact that this is your standard antitrust case where you have a seller's cartel, you have a buyer's cartel, and they are buying products and services from our clients, the out-of-body dealers, in order to have a contract with and serve their insureds. And because they can control a buyer's cartel, they can control and keep those prices down, it lessens the number of repairs, it weakens the number of repairs, the type of repairs aren't as good, and so the quality of the insurance goes down. There's a reason for them to keep this, to have this agreement. Absent the agreement, smaller, perhaps, than the big state farms and the big ones, would come in and say, look, we are going to pay the higher price, we're not going to stick with this agreed cap, we are going to pay for original equipment manufacturers, we're going to let you repair these to pre-accident condition, and we're going to try and gain market share and be competitive by then saying we have a better product. You're describing the basic structure of this market, which this Court went over in the in-bank decision. What is it about these complaints that makes your cases different? Let's just talk about Mississippi. In the Mississippi complaint, distinguishes those allegations from the ones in the in-bank complaint, and it's got to be something a lot more specific than this is a market structure in which everyone just follows state farm on price. Because in that complaint, there are very more specific allegations, factual allegations, to support the fact that there's an opportunity to conspire. What's your best two or three distinguishing allegations? The uniform price. Very specific about there's no market study, there's no survey, state farm keeps this price that they set private, they go out and get protective orders to keep it private, and What the in-bank Court referred to as the parallel conduct. You did. Parallel conduct, but how do you have parallel conduct when the other insurance companies don't know about it? The fact that they can all agree without knowing what that is, without any market studies, can never describe to our clients why they set that price, why it's the exact same as state farm. There are no studies. State farm, it's just an arbitrary calculation with this little ritualistic formulation that we detail in the Mississippi complaint as to how they come up with this amount. But why would these insurance companies, all the other insurance companies, go with this price absent an agreement? Obviously, we can't set the agreement, but another fact that we do allege and point out is the fact that there is an opportunity through the associations, and very specifically about how the representatives, executives of all these companies participate loosely in these discussions. Just on the pricing point, I mean, they tell every, you're right, they seek the protective orders, and that's a little odd, but they tell every body shop in a geographic market, this is what we'll pay for such and such service. That doesn't sound like a secret like in, I think it was Cement Institute, where they're sealed bidding, sealed bidding simultaneous, and lo and behold, the bids are the same to the penny. This seems far removed from that. But there isn't a market. There isn't a geographic market. We've shown in these complaints that one body shop in one part of the State and the other thousands of miles apart. No, but I mean, if they're telling, whatever, I don't use that term in a technical sense. If they're telling every body shop in some area, whatever it is, here's what we'll pay for a certain kind of repair, it doesn't seem like that's the kind of thing that would be a huge secret, so that you could draw an inference of conspiracy just because the competitor is... Is it plausible? Is it plausible that there is this conspiracy? Do we tip that balance just that much to show the plausibility? The other one you quickly asked me for, one other good example is the uniform refusal to follow industry standards, to repair the cars to the pre-accident conditions. It's uniform, what they will pay for, what they will not pay for, parts and not paying for new parts. Let's get one thing straight before, you've cut in, you've gone over, you've been answering questions from the court, so I'm going to save your rebuttal time. You'll have the five minutes. It seemed to me that the questions I was asking earlier about failure to file the amended complaint within the deadline pertains to, I believe, the Indiana-Utah actions, and Judge That wasn't that kind of situation. The motions, the jurisdictional questions in the Mississippi case, as I understand it, are issues about what was designated in the notice of appeal. They're not issues about filing the amended complaint past the deadline. Is it that right? Yeah. Yeah. Okay, that's good. Thank you. I appreciate it. Thank you. Mr. Cashton. May it please the Court. My name is Jeff Cashton of King & Spaulding. I represent the progressive insurance defendants in this case, and I'll be speaking on behalf of all the defendants. Some of my colleagues have reserved time. GEICO's counsel is here to address the court. Any questions the court may have arising from GEICO's alternative grounds for affirmance related to the failure to state an antitrust claim that violates the per se legal test and the waiver of the rule of reason? What's properly before us? Your Honor, as you've noted, there are jurisdictional issues for all of the cases, but in particular, the Indiana and Utah cases have jurisdictional issues for the failure to file a timely appeal pursuant to 28 U.S.C. 2107A. And you've put your finger on the issue, and the court asked us all to address it. The question is, when was a final judgment entered below? And that question is answered in this case by reference to the court's decision in Hertz, which makes it plain that if a date certain is provided for filing an amended complaint and that date certain is not met, then the final judgment is entered on the date that the amended complaint was due. And that's what happened in this case, both in Indiana and Utah. Judge Martin, you're correct. In Indiana, it was one day late or four hours late, and in Utah, it was two days late. The excuse given in Indiana, you're right, was the purported ECF excuse, which, by the way, is the same excuse the plaintiff's counsel offered as to why no reply brief has been filed in this court. And that was never pressure tested below because, as Judge Pryor stated, there was never a motion filed below for post-judgment relief under either Rule 59 or Rule 60B to amend the order. Instead, what happened was— There wasn't a Rule 6 motion filed either, right? There was never a Rule 6 motion filed at all. What happened, Your Honors, was that the plaintiffs went ahead and filed their amended complaints in those cases late. Defendants moved to strike those amended complaints as being tardy, also moved to dismiss. In response to the motion to strike and the motions to dismiss, the plaintiffs filed a response, and as part of that, they noted that they had these ECF and other issues. Judge Presnell, in ruling on the motion to strike and in the motions to dismiss, treated the opposition as a Rule 6 request for an extension of time and granted a two-day extension of time and a one-day extension of time. The problem is that, in the words of this court in Hertz, as of the time the final judgment was entered, to use the court's language, the trial court surrendered jurisdiction to provide any kind of pre-judgment relief, which is what Rule 6 is. So the only option available would have been Rule 59 or Rule 60B. Well, Rule 59 is out because you have to file a Rule 59 request for relief within 28 days of the judgment, and that did not happen. Even the opposition was not filed within 28 days of the judgment. So now we're down to Rule 60. This court specifically asked the parties, does Rule 60 apply? On September 7, 2017, plaintiffs' counsel said, quote, this court should not proceed under Rules 59 or 60B, end quote. Specifically said that. Now, maybe they said that because they understand that it would be a far reach to take their and to convert it into a motion asking for relief under Rule 60B for post-judgment relief. We do not disagree that this court has discretion and the trial court has discretion to do that. You're not required to simply go with the formal labels of a document. But there has to be some indication that the party was seeking that relief and maybe just named it the wrong thing. Here, there was no request for relief. They just filed an amended complaint late and proceeded on as if nothing had ever happened. And that's a bridge too far, in our view, Your Honor. As to the Mississippi case... Four hours late. Bridge too far. Four hours late. Because of... I mean, you're not asking us to make credibility determinations about what they say caused the four-hour delay. I'm absolutely not, Your Honor. But let's be clear. It wasn't like they were given one day to file an amended complaint. They were given 21 days to file that amended complaint. Well, I'm not a procrastinator either, but a lot of people are. Sure. And they could have at any time filed before that deadline a request for an extension of time under Rule 6. It would have been on file and then they wouldn't have been in this situation. Or they then could have filed a motion under Rule 59 or Rule 60B asking the court below post-judgment relief to please excuse their tardiness. They didn't do any of those things. It's not just that they made one mistake and filed the complaint late. They didn't seek relief pre-judgment or post-judgment in a motion asking for an extension of time or relief from the judgment. And that's all on them. That's no one else's wrongdoing. The Mississippi case, just to note, Your Honor, there is an issue with jurisdiction there because they failed to designate the order granting dismissal of the federal antitrust claims in their notice of appeal. And there is law from this court making clear that the notice of appeal designations are jurisdictional. What they did instead is they designated the motion for reconsideration denial in their notice of appeal. So before this court is the question of whether the district court abused its discretion in denying their motion for reconsideration. But the federal antitrust claims are not properly before this court because they were not designated in the Mississippi case in the notice of appeal. And we cited in the nationwide brief that was submitted, Your Honor, there was case law cited that, for example, the Grant v. Miami-Dade County case, that where you designate the motion for reconsideration but not the original order, I'm sorry, where you designate the order on reconsideration but not the original order, it's only the order on reconsideration that is properly before the court. Can I ask, do I have the chronology right? The basic chronology is the antitrust claims were dismissed, then reconsideration of that was denied, and then the state claims were dismissed. Yes, I believe that's correct, Your Honor. So none of these orders became final until the state claims were dismissed and the notice of appeal includes the dismissal of the state claims as one of the orders appealed from, right? Correct, Your Honor. So why doesn't, why isn't everything before us in the Mississippi case on the theory that if you appeal a final judgment, that takes up all the interlocutory orders that happened on the way to final judgment? I think, Your Honor, where the orders involve different claims and different subjects, that the law is that you have to designate the separate different orders. I understand that intuitively, but what's the case from this court that holds that? Well, the Grant case, as I mentioned, Grant v. Miami-Dade certainly holds that, Your Honor. In addition, I would refer you to the court, and this is set forth in the brief submitted by Nationwide and Safeco, and if you look at page 6 of that brief, we also cite the Gonzalez v. Thaler case from the Supreme Court, as well as the White v. State Farm case in this court, which holds, quote, when a notice of appeal names a specific order to be appealed, we must infer that the appellant did not intend to appeal other unmentioned orders or judgments. And so the White case from this court specifically contemplates a situation where there are multiple orders, and only one has been named and one has not been named, and that's exactly what happened here. Certain orders were named, but the order that dismissed the federal antitrust claims was not identified in the notice of appeal. But White was, if I'm remembering it correctly, what was appealed was the denial of reconsideration, right? I do not recall if that's the case. I know that was the case in Grant, Your Honor. Okay. Well, we'll take a look. In Grant, that was the case, and in Grant, this court held that the reconsideration order was properly on appeal on an abusive discretion standard, but the original order was not on appeal. I mean, it's just your argument has a lot of force to me, except for this idea that if you check the box of appealing the final judgment, you're generally in pretty good shape. I think that's generally right, Your Honor, where you have one order that covers the entire set of claims. But here, we don't have that, and they have to specify it. Okay. I got it. And they designate some orders, but not others. Precisely, Your Honor. Tell me this, though. Yes, sir. Before you finish up, I'm concerned about, with the Mississippi action, two of the allegations of steering, whether they should have been dismissed or not, tortuous interference claims. It seemed to me there was a customer who told Progressive she was taking her vehicle to auto works collision for repairs. Progressive responded it would guarantee the repair work if she went to its preferred shop, but not if she went to auto works. The second customer told Progressive she planned to use Walker's collision for repairs. Progressive responded if she took her car to a preferred shop instead of Walker's, Progressive would guarantee the repairs for life. The complaints allege that these statements about guaranteeing the repair work were misleading for two reasons. The insurers don't ever guarantee repair work themselves. At most, they require the preferred shops to guarantee the work. And the preferred shops often do not live up to these hypothetical guarantees. And second, the insurer statements mislead the body shop's customers and potential customers into assuming that the plaintiff's body shops don't guarantee their own work. It seemed to me that these were sufficient to state a claim, that they were intentional steering of two customers away from body shops in a manner calculated to cause damage to the body shops with the unlawful purpose of causing damage and loss without right or justifiable cause. And because the two body shops lost the business, they suffered actual damage. Why didn't the district court err when it dismissed those two claims? The district court did not err when it dismissed those claims in the Mississippi case for a couple of reasons, Your Honor. First of all, in Mississippi, tortious interference claims must include an allegation that the defendant engaged in some act with a malicious intent to interfere with the business of another. Mississippi courts specifically recognize that it is proper to engage in competition for prospective gain as long as tortious acts are not employed to further that gain. Thus, a claim for tortious interference requires bad acts exceeding the realm of legitimate competition that were committed without legal or social justification. Here the allegations relate to . . . If the allegation is that, look, Progressive is going to pay the same amount for repairs no matter where the work is done, why isn't that enough? Why isn't that enough with these allegations of steering away from these and misleading the customers about the guarantee? Well, because that allegation is slightly contradicted by what the plaintiff's actually alleged in the complaint, which is that Progressive and other defendants are motivated by the desire to make profit, which is a legitimate form of competition, and in particular, the form of competition described in this complaint was recognized by this court en banc as being perfectly legitimate, and as a result, it doesn't qualify as a bad act under Mississippi law. And when the district court scrupulously considered all of the allegations, it concluded that there had not been any allegations of a bad act. These were truthful statements. The complaints themselves alleged that it was truthful that Progressive would not be warranting any of that work, and Progressive was simply implementing its DRP plan, telling the customers the truth, and the customers then could decide in the end where they wanted to go. And let's not forget that even under this theory, these customers still could have chosen to use the body shops because Progressive nor any other defendant precludes them from choosing the body shop of their choice. Aren't there allegations that the defendants made false or misleading statements about the quality of the work, the length of time it would take to do the repair, things of that nature? There are allegations that defendants made statements about those issues, and there is a conclusory assertion in one paragraph that those statements were false without tying them to any particular prior allegations. We don't know whether in any particular case are the plaintiffs saying those allegations were true or false. As to these specific examples that Judge Pryor is providing, there's no claim that any of the statements that were made were false. It was actually true that Progressive would not warranty the work if it was done at that body shop. The allegation is that they were misleading. Well, there's no... And isn't that right? That's what they alleged. They say that magic word, but they don't actually provide any evidence in the complaints of supporters. And they say the reason it was misleading is because Progressive doesn't guarantee work anyway. They make a general allegation that the defendants don't guarantee work anyway without specific reference to any particular defendant. And they say that it also suggested that the other body shops wouldn't be guaranteeing. The ones that they preferred wouldn't be guaranteeing. Which was accurate. At least that Progressive wouldn't guarantee that work. The other thing to note, Your Honor... No, no, no. They say the misleading aspect was what Progressive was saying, it was suggested that those body shops wouldn't be guaranteeing their work. They make the conclusory allegation that the statements were misleading for that reason, Your Honor. But they fail to provide, of course, and I should note that in some of these tortious interference cases, including the ones you're discussing, they are using unidentified false statements made to unidentified third parties to deceive these unidentified third parties not to use the body shops. These tortious interference claims, though, sounded fraud. In fact, what you're describing is a fraud-type claim. And so Rule 9b would apply to those kinds of allegations. And they do not allege those claims with the specificity you would anticipate and require under Rule 9b. I see the clock has me, Your Honor. Certainly, it's our view that these claims are identical in every respect to the ones that the en banc court dismissed in quality auto. The only exception, as we put it in our briefs, is that we think the tortious interference claims fail for reasons beyond the group pleading. We would ask the court to affirm... Just one question on that. Yes, Your Honor. If we assume we agree with the conduct described by Judge Pryor states certain discreet tortious interference claims, question about the scope of the remand, why wouldn't we... Would we remand just as to the little pieces that we identify in the complaint? Or would we have to remand for all tortious interference claims under the reasoning of the en banc court that this is not shotgun pleading? We're not going to make individual, we're not going to require identification of individual customers who were steered? Well, the en banc court only considered the group pleading doctrine. Here, we have everything, including evaluation of the merits of the claims up on the appeal. And so I think the appropriate... First of all, I think, of course, none of the claims satisfy. But if the court were to find that as to some of the allegations, they appear to satisfy the... Right. ...requirements for tortious interference, I think that the remand would only be for those particular claims. I don't think that the plaintiff's complaint... And why doesn't the group pleading holding of the en banc court cut against you on that point? Well, because we put that to the side. Let's assume we lose the group pleading here. The issue is that the tortious interference claims in this case were dismissed for other reasons as well. The failure to allege malice, the failure to allege that some of these activities actually were accomplished. For example, in all of these states, you're required to show damage and injury to support a tortious interference claim. If there was attempted steering, but it didn't actually happen, the customer actually went to the repair shop, as alleged in the complaint, there's no tortious interference claim. So they have all that detail in there, and I think that would be the way to proceed. And then the district court can decide whether to exercise supplemental jurisdiction. Okay. Thank you. Thank you. Mr. Jones. Mr. Kinney, I'm sorry. May it please the court, Michael Kinney on behalf of State Farm. I want to make two quick points. The first is the antitrust point following up on a question Judge Katsas, you asked the appellant's counsel, and that's this. This court on October 9th of this year gave a directive to the parties. They said, essentially, tell us what's different in these three complaints that we have before us that wasn't decided in the en banc decision. What they supplied you in a supplemental letter brief was a truncated version of their Utah complaint. Judge, you asked with regard to Mississippi, well, tell me what's new. The answer is there is nothing new. They talked about uniform pricing. This court exhaustively dealt with uniform pricing in the en banc decision. So the answer to the question of what's the impact of the en banc decision on this case for the antitrust cases at least, and that is it's outcome determinative, it's dispositive. Those cases all should be dismissed on the merits regardless of the jurisdictional issues. I want to take one shot. Not regardless. Right. If we find there is no jurisdiction, that's the end of the inquiry. I agree with that, Your Honor. I want to take one shot at shotgun pleading. I tried this in the panel decision below. I tried it in the en banc. Even with shotgun pleading, I would suggest in this case that the en banc panel, and two of you were honored, of course, you were very narrow in your decision. You noticed, you decided it as a notice issue, and you said in four of the five complaints there was only one plaintiff, and there were only a few defendants. I would encourage, Your Honor, to implore Your Honors to go back in these three complaints. There are a few of them, 26, 28 plaintiffs, 26, 28 defendants. I think materially and qualitatively the issue of whether the defendants are on adequate notice is different, and that could be a basis to distinguish the en banc decision on tortious interference. Thank you. Thank you, Mr. Kenney. Mr. Jones. Thank you, Your Honor. May it please the Court, Brian Jones, Indiana Farmers Mutual speaking on behalf of the appellees in the Indiana and Utah cases. Briefly on jurisdiction, Your Honor, I wanted to make one quick point. Both parties agree that this Court should not construe any motion under Rule 60B or anything that was done under Rule 60B in this case, because there was, in fact, as Judge Prior, you pointed out, there was no motion filed. There was one minor factual development that occurred, at least in the Indiana case in that is that we know from the metadata in the Second Amendment complaint that the plaintiffs filed, it was not even created until the amendment period had already expired. That document itself did not exist until the amendment period had expired. Regardless of whatever the purported allegations in the ECF system were, that document was late to begin with. And the reason we don't have that fully addressed is because, as you pointed out, Your Honor, the plaintiffs never even filed a motion at all. Thank you. Okay. Mr. Shurtleff, five minutes. Thank you, Your Honor. Just addressing the Mississippi complaint, then, you asked some specific facts about the steering or the tortious interference allegations. Going back to the purpose of Twombly in this balancing test, the balance in antitrust cases being the cost of discovery primarily in antitrust cases and the burden on the antitrust plaintiff and the access to the court issue. So the issue here with regard to how much we can allege and result is that the fact that the defendants have all the evidence with regard to steering. We believe, in that case, sufficient allegation, specific fact situation of a tortious interference, the malice demonstrated as part of a practice that's consistent throughout this industry, and that is making the misrepresentation that we won't ensure, when they know they don't ensure or guarantee, excuse me, don't guarantee any of the work done. It's like submitting to the court a search warrant affidavit and saying, well, we didn't make any false statements, but it's full of misleading statements. It also can establish the malicious intent as far as the steering is concerned. We have no further answer with regard to jurisdictional issues. We're down. It sounds like in the court's opinion of the panel right now that there's maybe a misplaced... Mr. Shurtleff, I'm just trying to make sense of prior panel precedent. I understand. I understand, Your Honor, completely. We've got the Hertz decision. I'm reading it, and I'm trying to make sure I understand how it applies to the case, and I'm bound by it, whether I agree with it or not, right? I understand completely. We're bound here today by what prior counsel did in that case and can't make anything different but other than include our case in the Mississippi case, so we clearly understand that. I get it. If there are no further questions, then I will submit. Thank you. All right. Thank you. Last case is...